18-2449-cv
Bldg. Serv. 32BJ Health Fund v. Nutrition Mgmt. Servs. Co.

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, at 40 Foley Square, in the City of New York, on the 10th day of October, two thousand nineteen.

PRESENT: JOSÉ A. CABRANES,
　　　　　REENA RAGGI,
　　　　　CHRISTOPHER F. DRONEY,
　　　　　　　*Circuit Judges*.

───────────────────────────────────────────

BUILDING SERVICE 32BJ HEALTH FUND,

　　　　　*Plaintiff-Appellee*,

　　　v.　　　　　　　　　　　　　　　　No. 18-2449-cv

NUTRITION MANAGEMENT SERVICES COMPANY, AKA Nutrition Management Services, Inc., AKA Nutrition Management,

　　　　　*Defendant-Appellant*.

───────────────────────────────────────────

FOR PLAINTIFF-APPELLEE:　　　　IRA A. STURM (Samuel Bloom, *on the brief*), Raab, Sturm & Ganchrow, LLP, Fort Lee, NJ.

FOR DEFENDANT-APPELLANT:　　　JOHN H. POPE, Eckstein, Becker & Green, P.C., New York, NY.

Appeal from a final judgment of the United States District Court for the Southern District of New York (Forrest, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **VACATED** and **REMANDED** for a redetermination of damages and the award of attorney's fees.

Defendant-Appellant Nutrition Management Services Company ("NMSC") appeals from a final judgment in favor of Plaintiff-Appellee Building Service 32BJ Health Fund ("the Health Fund"). The circumstances giving rise to this action are substantially similar to those resulting in an ERISA action by the 32BJ North Pension Fund against NMSC. *See 32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93 (2d Cir. 2019) (vacating and remanding judgment for determination of damages). As we described in *32BJ N. Pension Fund*, NMSC entered into a collective bargaining agreement ("CBA") in 1998 that required it to make pension contributions on behalf of its employees to the pension fund and also, as pertinent here, to make healthcare-benefit contributions to the Health Fund. The language of the pertinent documents in this appeal is materially the same as in the pension fund action, except that the CBA language requiring NMSC to make Health Fund contributions is stated in Article 21, while the (essentially same) pension fund language is in Article 22.

As with its delinquent pension contributions, NMSC failed to make the required healthcare-benefit contributions from 2008 to 2015, and the Health Fund brought this ERISA action seeking unpaid contributions. Following a bench trial, the district court issued an opinion with findings of fact and conclusions of law, and awarded the Health Fund damages for those unpaid contributions, which also included interest and liquidated damages.[1]

On appeal, NMSC raises several issues with respect to the district court's calculation of damages, one of which is materially the same as the interest-rate issue raised in the pension fund appeal. NMSC also contends that it is entitled to a redetermination of the award of attorney's fees in light of the presumably diminished damages award to which the Health Fund will be entitled on remand. We otherwise assume the parties' familiarity with the underlying facts and the procedural history of the case.

**STANDARD OF REVIEW**

"On appeal from a bench trial, we review conclusions of law *de novo* and findings of fact for clear error." *Id*. at 97–98 (internal quotation marks omitted). "[W]hether the [district] court correctly calculated damages is a question of law that we review *de novo*." *Lauder v. First Unum Life Ins. Co.,* 284 F.3d 375, 379 (2d Cir. 2002); *see Wolff & Munier,*

---

[1] The district court also later issued an opinion regarding liquidated damages and post-judgment interest, which is not at issue on appeal.

*Inc. v. Whiting-Turner Contracting Co.,* 946 F.2d 1003, 1009 (2d Cir. 1991) ("Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." (citation omitted)).

## DISCUSSION

### I.    The Damages Award

We address in turn each of NMSC's challenges to the district court's award of damages.

#### A. Interest Rate on Unpaid Contributions

As in the pension fund appeal, NMSC argues that the district court erred by applying to NMSC's unpaid contributions before August 1, 2013, the interest rate stated in the delinquency policy adopted by the trustees of the Health Fund. That interest rate was at all relevant times higher than that provided by ERISA's default interest-rate scheme. *32BJ N. Pension Fund*, 935 F.3d at 98 n.9. NMSC contends that it was not bound to the delinquency policy's interest rate until it executed a Memorandum of Agreement in 2014 ("MOA")— the same one described in the pension fund appeal—which was effective as of August 1, 2013. The Health Fund argues that NMSC was bound to the delinquency policy's interest rate because the rate was stated in an ERISA "plan" document[2] and that it was unnecessary for NMSC to agree to be bound to the plan—or even "reference" it in a CBA, as the pension fund had (unsuccessfully) contended was sufficient in the pension fund appeal, *id.* at 99. The district court here held that the delinquency policy's interest rate applied at all relevant times because that document was part of the ERISA "plan" and because NMSC had also "specifically agreed to be bound by the terms of the Trust Agreement" under which the delinquency policy was adopted. *Bldg. Serv. 32BJ Health Fund v. Nutrition Mgmt. Servs., Co.*, 15-cv-3598, 2018 WL 3019880, at *4 & n.4 (S.D.N.Y. June 15, 2018).

We agree with NMSC that the district court erred in applying the delinquency policy's interest rate before August 1, 2013. To impose an interest rate other than the one provided by 26 U.S.C. § 6621, it must be: (1) stated in "the [ERISA] plan;" and (2) "[t]he employer must . . . have agreed to bind itself [] to the plan document." *32BJ N. Pension Fund*, 935 F.3d at 99. For the same reasons discussed in the pension fund appeal, *id*. at 100–01*,* NMSC did not agree to be bound to the plan document until it executed the 2014

---

[2] *See* 29 U.S.C. § 1132(g) ("[I]nterest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26.").

MOA, effective August 1, 2013.[3, 4]  This error of law by the district court requires it to redetermine the amount of damages on remand.

## B. Whether the Parties' Settlement Agreement Extinguished Certain Claims

NMSC also argues that a settlement agreement reached between the parties in 2012 extinguished the Health Fund's claim to unpaid contributions for the period from August 1, 2008, through January 31, 2012.  In that settlement agreement, NMSC agreed to pay $300,000 to the Health Fund "in full satisfaction of unpaid benefit contributions for the reporting period beginning August 1, 2008 through January 31, 2012." App'x 36, ¶ 1.  The agreement included the following exception, however:

> The contributions covered by this Agreement refer only to those contributions based on the Employer's previous reporting and *do not* include unpaid contributions, if any, reported by *future Funds' payroll audits*.

*Id*. ¶ 3 (emphasis added).

The district court disagreed with NMSC, holding that the exception unambiguously allowed the Health Fund to seek unpaid contributions that became delinquent during the pertinent period, provided that they were discovered by an audit of the Health Fund's payroll records conducted after January 31, 2012.

We agree with the district court that the agreement is unambiguous and that NMSC's interpretation is wrong.  It is well established that "[s]ettlement agreements are contracts and must therefore be construed according to general principles of contract law." *Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir. 1999).  The agreement exempts from its scope claims for unpaid contributions that are "reported by future Funds' payroll audits." App'x 36, ¶ 3.  The word "future," in this context, is an adjective that modifies the words "Funds' payroll audits." *Id*.  Therefore, if—as we consider next—the audit of the Health Fund's payroll was conducted in the "future" (*i.e.*,

---

[3] Unlike in the pension fund appeal, the Health Fund also argues, perfunctorily, that the 2014 MOA made the delinquency policy's interest rate retroactively applicable to all delinquent contributions, from 2008 onward.  But the MOA established that "[t]he term of the new collective bargaining agreement shall be for the period [starting] from August 1, 2013." App'x 82.  The Health Fund does not acknowledge this language and provides no basis for why August 1, 2013 was not the first date on which the delinquency policy's interest rate could be assessed against NMSC's unpaid contributions.

[4] As in the pension fund appeal, we do not resolve certain potential issues regarding the August 1, 2013 effective date of the MOA and the accrual of interest on certain unpaid contributions, nor whether ERISA's statutory interest applies to delinquent contributions that a defendant belatedly made prior to the plaintiff's filing of suit.  *See 32BJ N. Pension Fund*, 935 F.3d at 101 nn.12–13.

4

after January 31, 2012), the unpaid contributions it discovered would be excepted from the settlement agreement.[5]

## C. Whether the First Audit Was a "Future" Audit Under the Settlement Agreement

NMSC also argues that, even under the Health Fund's interpretation of the settlement agreement, much of the audit as to the period of August 2008 to May 2013 (the "First Audit") was conducted prior to January 31, 2012, and thus was not a "future . . . audit[]" under the settlement agreement. *Id.* In support, NMSC contends that the Health Fund auditor, Shahnawaz Khan, testified that he relied on the "payroll audit" conducted in 2011 by Stuart Gritz for the pension fund. Appellant's Br. 32. NMSC avers that this effectively backdated Khan's audit to 2011, when Gritz conducted his audit of the pension fund.

NMSC's characterization of Khan's testimony is inaccurate. Khan testified that his First Audit of the Health Fund began only in late 2013. He did not testify that he obtained Gritz's "payroll audit," but merely that he obtained Gritz's "payroll recap" of NMSC's payroll records for the period from August 2008 to June 30, 2011, and that Khan's health-fund audit used that payroll recap as source material. App'x 320–21. NMSC points to no evidence that the payroll recap was itself an "audit." We therefore identify no error in the district court's factual conclusion that Khan's First Audit began in 2013 and, thus, was a "future" audit outside the scope of the settlement agreement.

## D. Challenges to Interpretations of the CBA Underlying the Audit Assessments

NMSC also argues that Khan's assessment of unpaid contributions in his audit was infected with several erroneous interpretations of the CBA, which resulted in an overstatement of contributions owed, and that the district court failed to consider these questions of law. We address these issues in turn.

### 1. Assessment of Unpaid Contributions for Employees Who Did Not Work More Than 20 Hours Per Week

NMSC first contends that the district court improperly accepted, without modification, Khan's calculation of unpaid contributions, notwithstanding that he testified that he mistakenly applied certain language in the CBA. Article 21 of the CBA states that NMSC "shall contribute to the Health Fund the sum of $256 per month for all employees in the bargaining unit regularly working *more than* twenty hours per week." App'x 453 (emphasis added). Khan testified that he "mistake[nly]" included employees who worked

---

[5] By contrast, under NMSC's interpretation, the agreement would have to be reworded to have "future" modify "unpaid contributions," for example.

5

exactly 40 hours in a bi-weekly period (20 hours per week).[6]  App'x 319.  NMSC undisputedly raised this issue at trial, yet the district court did not address the issue in its trial findings.

The Health Fund argues that, as a general matter, an auditor's calculations are sufficient evidence of damages in an ERISA case.  But that general proposition is not in dispute; here, NMSC identified an uncontested legal error underlying a particular audit, and the district court erred by failing to consider the impact of that error on its measure of damages.  *Cf., e.g.*, *Reilly v. Reem Contracting Corp.*, 380 F. App'x 16, 20 (2d Cir. 2010) (summary order) (remanding ERISA award for redetermination of damages where auditor's report relied on a "bald and unsupported assumption" about the application of CBA language).  In redetermining its award of damages, the district court should exclude damages for unpaid contributions for employees who did not "regularly work[] more than twenty hours per week."[7]  App'x 453.

## 2.  Whether NMSC Was Entitled to Offsets for Employee "Pickups"

NMSC also raises another significant issue with the auditor's interpretation of the CBA, which NMSC raised at trial but the district court did not address.  Khan's audit revealed that, at times, NMSC reported to the Health Fund the names of individual

---

[6] Khan testified as follows:

> Q. So you would have excluded the [times] where [the employee] didn't go above . . . 40 hours [in a 2-week period]; is that what you did?
> . . .
> Answer by Khan: No, I assessed for those months where the individual worked 40 hours [in a bi-weekly period].
> Q. What is the basis for your assessing somebody who worked 40 hours [bi-weekly]?
> A.  I must have made a mistake.
> Q.  Somebody who worked 40 hours [in a bi-weekly period] should have been excluded?
> A. Yes . . . .

App'x 319.

[7] NMSC also contends that Khan's interpretation of the word "regularly" in the CBA made the audit fundamentally unreliable.  NMSC was required to make contributions only for employees "*regularly* working more than twenty hours per week."  App'x 453 (emphasis added).  The record on appeal is not well developed as to how Khan chose to interpret the term "regularly," nor is it clear how his interpretation affected the damages calculation.  However, based on the trial transcript, it appears that the district court found this argument deserving of some consideration, yet it did not resolve the issue in its trial findings.  *See* App'x 731 ("But in all events, one of the ways that the Court can determine that [Khan] is incorrect is because he didn't reflect the use of the term 'regularly' at all . . . ." (internal quotation marks added)).  We do not foreclose the possibility that, under the relevant standards, the district court may deem this argument undeveloped or otherwise forfeited based on the record in the district court, but it should resolve the issue if raised on remand.

employees who did not satisfy the CBA requirements ("ineligible employees") and thus for whom NMSC was not required to make healthcare-benefit contributions, but also did not report the names of some employees who did satisfy the CBA requirements ("pickups") and thus for whom NMSC was required to make contributions. Khan's audit assessed NMSC unpaid contributions for the pickups, but it did not also credit back NMSC for the amounts it paid on behalf of the ineligible employees.

NMSC argued in the district court, and argues on appeal, that Article 21 of the CBA required it to pay contributions for only the correct absolute number of employees, even if it erred in its reporting to the Health Fund of which individual employees were covered by Article 21. The district court did not address this contract-interpretation question in its trial findings, and the Health Fund does not address the issue in its response brief. On remand, the district court should also address this issue.

## II.     Attorney's Fees

Lastly, NMSC also argues that the district court should redetermine its award of attorney's fees in light of the diminished damages award to which the Health Fund will be entitled on remand. The Health Fund does not contest that point. Accordingly, we direct the district court to reconsider the amount of its fee award after redetermining the damages owed to the Health Fund. *See 32BJ N. Pension Fund*, 935 F.3d at 102–03 (vacating award of attorney's fees where the pension fund did not dispute that redetermination was appropriate).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **VACATED** and **REMANDED** for a redetermination of damages and the award of attorney's fees.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

7